[Civ. No. 3433.  Third Appellate District.—March 14, 1928.]

F. C. LAIRD, Appellant, v. ANNA McPHEE, Respondent.

Brittan & Brittan, F. E. Borton and James Petrini for Appellant.

Wiley & Harvey for Respondent.

BUCK, J., *pro tem.*—This is an action to enforce specific performance of an agreement alleged to have been entered into between plaintiff and defendant, whereby defendant agreed to execute, and plaintiff agreed to accept an oil lease from defendant of certain designated lands owned by defendant.

The trial court made a finding to the effect that defendant never did execute any agreement with plaintiff whereby defendant agreed to lease to plaintiff the designated premises upon the terms and conditions specified in the complaint. Judgment was given for defendant and plaintiff appealed.

The sole question arising on this appeal is whether the evidence is sufficient to sustain the above finding of the trial court.

Plaintiff was a resident of McKittrick, near Bakersfield, in the county of Kern, and was engaged in the business of buying, selling, leasing, and operating oil lands. Defendant, a married woman, was a resident of the state of Washington and the owner of a 560-acre tract of prospective oil lands in Kern County. To assist her locally in carrying on negotiations with plaintiff for the leasing of a portion of said lands with an option to purchase, she employed Mr. William Beaizley, an attorney at law of Bakersfield, in Kern County. After some preliminary negotiations by correspondence with plaintiff, the defendant received, on February 28, 1925, from plaintiff the following telegram:

"Received your letter visited Mr. Beaizley am prepared to pay seventeen fifty acre bonus four hundred acres option to buy at sixty wire Mr. Beaizley authority to write up papers so property can be turned to me so I can be sure of deal as I have other land in view but wish to settle your proposition before starting anything else wire box 536 Bakersfield, F. C. Laird."

To which defendant made answer as follows:

"Your offer accepted. Sending Beaizley letter instructions immediately acreage designated."

Up to this time there had been no attempt by either party to designate out of what particular part of defendant's 560-acre tract the 400 acres desired by plaintiff was to be selected. But, in order to make definite that matter, as well as some of the other terms of the proposed lease, defendant on March 2d wrote to Mr. Beaizley at Bakersfield, in substance, that she had wired the defendant Laird that "I would accept his offer and would consult you immediately by following letter. Am enclosing you the original Standard Oil lease which prevailed on the property, which I believe fills the needs and embodies everything necessary, and I would like embraced in the Laird lease, and may serve as a copy

. . . and no subleasing or sequestration of the property to another, as you may remember the siege you had in disposing of other sublessees . . . Now, as to that designated 160 acres to be retained by me, I would reserve the following acreage as diagram indicates.''

In this connection it may be noted that the 560-acre tract owned by defendant embraces the whole of one section of land, except the east half of the southeast quarter of the section, and that the 160 acres reserved by defendant was all in one body and consisted of ''the Southeast quarter of the northwest quarter and the southwest quarter of the northeast quarter of said section, and also the 80 acres designated as the west half of the southeast quarter.'' This also left the 400 acres offered to plaintiff in one body, though of a somewhat irregular shape. Possibly the land was so designated in order to give the portion reserved by defendant a closer contact with the different portions of the 400 acres to be developed by plaintiff as oil-producing land. But, in any event, the proposed designation was certain and explicit. And as was said of old, ''it is trite learning that the thought of man is not triable, for the devil himself knows not the thought of man.'' (Brian in Year Book, 17 Edw. IV, 1.)

As regards the other terms and conditions upon which defendant was offering to lease, she inclosed, as stated, also for the information and instruction of her attorney and the plaintiff, a lease which she had at one time given to the Standard Oil Company.

On March 7th, and very soon after receipt of the above letter by the attorney, plaintiff called at the office of Mr. Beaizley and was informed of the contents of the letter and of the terms upon which defendant was offering to lease, and was also shown the diagram and a description which designated the 400-acre tract which she was offering to lease to the plaintiff.

For the purpose of satisfying the statute of frauds, it may be assumed that the foregoing writings and memoranda made by the defendant constituted a sufficient offer in writing to bind the defendant, if accepted by the plaintiff before its withdrawal by defendant. (*Johnson* v. *Krier*, 59 Cal. App. 330 [210 Pac. 966]; *Albion Lumber Co.* v. *Lowell*, 20 Cal. App. 782, 793 [130 Pac. 858, 864]; *Moss* v. *Atkinson*, 44 Cal. 3; *Estate of Robinson*, 142 Cal. 152 [75 Pac. 777].) It

would not be necessary that such acceptance by the defendant prior to the withdrawal be in writing. (*Harper* v. *Goldschmidt,* 156 Cal. 245 [134 Am. St. Rep. 124, 28 L. R. A. (N. S.) 689, 104 Pac. 451].) The acceptance, however, of course, must be unequivocal, positive, and unambiguous, and must comply with the terms of the offer. It is also the rule that after making a positive acceptance of the offer, the party so accepting may add, as a request, that some modification be made. And "so long as it is clear that the meaning of the acceptance is positive and unequivocal to accept the offer, whether such request is granted or not, a contract is formed." (Vol. 1, Williston on Contracts, p. 138; *Turner* v. *McCormick,* 56 W. Va. 161 [107 Am. St. Rep. 904, 67 L. R. A. 853, 49 S. E. 28]; *Curtis Land etc. Co.* v. *Interior Land Co.,* 137 Wis. 341 [129 Am. St. Rep. 1068, 118 N. W. 853]; *Berthiaume* v. *Doe,* 22 Cal. App. 78, at page 80 [133 Pac. 515].)

The above rule is earnestly invoked by the plaintiff's counsel in this case. And plaintiff, in his examination in chief regarding what he remembers he said at his conference on March 7th with defendant's attorney, places himself by his own testimony well within the rule invoked by his able counsel, his testimony in chief being in substance as follows:

"Q. Upon receipt of the last telegram just referred to, what, if anything, did you do with reference to Mr. Beaizley? A. I went to see Mr. Beaizley and had a talk with him about paying for the acreage. Q. Relate the conversation you had with Mr. Beaizley. A. I showed him this telegram, and told him the offer of Mrs. McPhee was accepted; I was able, ready and willing to pay the money and offered him the money for the proposition. He said 'About the acreage?' I said 'Don't make any difference about the acreage, as long as you get four hundred acres,' I had the money, I said and was prepared to pay him then. He said he didn't care about taking the money; he said to put it in the bank to her order. So he brought up the subject about the acreage; said that she wanted it all in one piece, the remaining one hundred and sixty acres, and the four hundred acres all in one piece. I said 'That is all right with me, whatever will be convenient to her and better for her will be all right with me.' I said, 'I simply want four hundred acres of land.' He said, 'That is the only point necessary to complete the

140

deal.' He said that he would take up with her again. I said, 'All right.' I told him the deal was accepted by me and I was ready to pay the money. 'All right,' he said, he would write up the papers. I asked if he had authority to do that, and he said 'yes.' That is the last I heard of the matter."

"Q. What was said about the money you were to pay to Mr. Beaizley at that time? A. Well, he just simply said, 'You have the acceptance. This land is yours. Nobody has any chance to get it now, at all. It is yours. If you want to pay the money, just pay it to the bank." . . . "Q. How much money did you have there with you at Mr. Beaizle's office, and afterwards deposited with the Security Trust Company? A. Seven thousand dollars to pay the bonus."

And in his cross-examination on the subject of his unequivocal acceptance of the acreage designated by the defendant, he testified as follows:

"Q. Did you get any selection of the 160 acres from Mr. Beaizley? A. No, sir. Q. As to what she wanted? A. No, sir. Q. Didn't Mr. Beaizley tell you he had a letter that she wanted to reserve 160 acres? A. She wanted to reserve one hundred and sixty acres in the letter I had here; she stated she wanted that all in one piece. I told Mr. Beaizley that it didn't make any difference, didn't matter how it was arranged, as long as I got four hundred acres she could have it all in one piece, it was agreeable to me. He said that was all right. Q. Don't you remember telling Mr. Beaizley you would like to have that selected differently from what she had designated it? A. No."

But it is apparent from the finding of the trial court that the court did not choose to accept the foregoing unqualified testimony of the plaintiff in regard to what he remembered was said at the conference of March 7th; but chose rather to accept the recollection of defendant's attorney, Mr. Beaizley, in regard thereto. Aside from any question as to the relative interests of the parties and their manner of testifying, as well as the intrinsic probability of their respective testimony, it appears that on the very day of the conference attorney Beaizley, in pursuance of his duty under his instructions, wrote to the defendant a letter giving an account of what took place at that time between himself and the plaintiff. From this letter, written as it was before there

was any controversy between the parties, he was able to refresh his recollection, and he further testified that this letter "substantially states the facts as they occurred at that time—substantially reports the occurrence," the letter being as follows:

"This will acknowledge yours of the 2nd inst. with enclosures of form of lease and also diagram showing the land you desire to reserve for yourself in section 36, 29 R 21 E, M. D. B. & M. Mr. Laird has called today and states that the reservation you suggest would make it extremely difficult for his operations on the property and would in fact necessitate the establishment of two shipping places. He asks if you would not be satisfied to reserve the northeast quarter rather than the parcels you have described. . . . The form of the lease and the limit of December 1, 1925, for exercise of option will be acceptable, and I think if you would be satisfied to reserve the Northeast quarter rather than the parcels you have described, the matter could be closed along these lines. Kindly let me know your decision in the matter and I will proceed accordingly. W. B. Beaizley."

And, further testifying, Mr. Beaizley states that he had been an attorney practicing law in Bakersfield more than 17 years, and knew both of the parties to the action, and that he acted on behalf of Mrs. McPhee "in the negotiations and preparation of the lease and so on." That plaintiff was in his office shortly after the receipt of the letter of March 2d, and "I there showed him the letter, or practically disclosed all of its contents to him. . . . I showed him the diagram that Mrs. McPhee enclosed in the letter. I remember, after he looked it over he said: 'That won't suit me' or 'I can't use it that way' or something of that kind. He expressed dissatisfaction. I can't recall the exact language or phrase he used but he expressed a dissatisfaction with the reservations that Mrs. McPhee had indicated on the diagram. That was his statement. After the statement made by Mr. Laird, I asked him why the reservation was not satisfactory. 'Well,' he said, 'I would have two shipping points' or something of that kind. I don't know whether I am right as to my recollection as to two shipping points. Made it inconvenient for him to operate here due to the contour of the country. He said, 'I wonder if she wouldn't be

satisfied to have a different division'; I said 'In what way?' Then he began to plan out a division that would suit him and, in fact, we both began to figure on what kind of an acreage would perhaps suit him and at the same time leave Mrs. McPhee the acreage she had reserved. Q. Did he then make any request as to any particular acreage she would reserve? A. Yes, Mr. Laird suggested how he would like it divided. And I had in mind Mrs. McPhee's letter, and, of course, I was seeking, as desired by Mrs. McPhee, to have what was to be reserved by Mrs. McPhee, in a compact, single parcel; and the division that I finally suggested to Mrs. McPhee in the letter that I wrote, was the one that Mr. Laird indicated that he would wish and asked that I would write to her and see if that would be suitable to her." No immediate reply being received to his letter of March 7th, Beaizley telegraphed defendant as follows on March 16th: "Have you my letter of seventh Laird wishes to know if reservation of Northeast quarter of Section to you is satisfactory. W. B. Beaizley." To which defendant answered as follows: "Reservation requested in offer made by you not accepted. Do not desire to negotiate further." This telegram was then shown to the plaintiff, whereupon, according to Beaizley's testimony, the following occurred: "I did communicate the wire to Mr. Laird. Q. What, if anything, did he say? A. I can't recall the exact sequence of the conversation but the substance of it. Mr. Laird said: 'I suppose that throws me back on the original proposition.' " Thereafter on March 21st Beaizley, at the request of the plaintiff, mailed to the defendant for her signature a draft of a lease containing the description originally proposed by defendant.

Bearing in mind that the burden rested, not upon the defendant to prove that the plaintiff rejected her offer, but upon the plaintiff to prove that he accepted her offer, it would seem to be quite evident that the evidence was amply sufficient, in view of the testimony of Mr. Beaizley and the subsequent conduct of the plaintiff, to sustain the implied finding of the court that prior to his claimed request for a mere modification the plaintiff did not definitely, unequivocally, or at all, accept any proposal of the defendant in regard to the subject matter of the lease.

Referring again to the letter of Beaizley of March 7th, it will be noted that the only thing he attempted to report from the plaintiff as "acceptable" about the lease was "the form of the lease." But that as regards the subject matter of the proposed lease the defendant had nothing to express except dissatisfaction, dissent, and disagreement. Also, from the stipulation inserted in the very lease which plaintiff was sending to defendant, in pursuance of his belated attempt to accept the lady's original proposal, it is quite apparent that as regards the form of lease in one important particular he never had any intention of accepting defendant's original proposal. For, in the Standard Oil lease, as well as in defendant's letter of instructions to her attorney, of which plaintiff was fully advised, it was expressly provided that the lessee should not have a right "to assign or sublet to anybody." But in the lease afterward drafted and mailed on March 21st to the defendant, at the request of the plaintiff, it is stipulated that the lessee shall have the right to assign the lease to the "Olig Hill Oil Company, a California corporation having its principal place of business at Bakersfield," and there is no provision made in the lease that such company, when it is so transferred, shall not have the right to assign or sublet at pleasure.

The defendant was thus left without any protection against subsequent assignments, even though there was a general covenant against assignments. For such a general covenant does not run with the land. (*Webb* v. *Jones*, 88 Cal. App. 20 [263 Pac. 538].)

The evidence, therefore, being sufficient to sustain the finding of the trial court that there was no agreement for a lease between the parties, the judgment is affirmed.

Hart, Acting P. J., and Plummer, J., concurred.